Louis A. **MOVITZ,** Trustee for the Bankruptcy Estate of J. Fife Symington III, Plaintiff—Appellant,

v.

Stephen Randall **TODD,** husband; Karen J. Todd, wife; Core/Jackson Inc., an Arizona corporation, Defendants—Appellees.

No. 00–16179.

D.C. No. CV–98–00909–RCB.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 2001.

Decided Nov. 27, 2001.

Before FERNANDEZ, RYMER, and WARDLAW, Circuit Judges.

### MEMORANDUM *

This fraudulent conveyance action arises in connection with the bankruptcy of Fife Symington, an Arizona real estate developer. The bankruptcy trustee, Louis Movitz, sued Stephen Todd, one of Symington's long-time business associates, under 11 U.S.C. § 544(b), to recover the value of various economic benefits that Symington had allegedly channeled to Todd before bankruptcy. The district court granted Todd's motion for summary judgment, concluding that the trustee had failed to make a prima facie showing that Symington ever owned any of the assets in question within the meaning of the relevant state fraudulent transfer laws. We have jurisdiction under 28 U.S.C. § 1291, and affirm.

Arizona's enactment of the Uniform Fraudulent Transfer Act (UFTA) permits an aggrieved creditor to set aside any transaction whereby the debtor has fraudulently disposed of or parted with an interest in anything that he may own. A.R.S. §§ 44–1001(8), (9); 44–1001(1). We do not need to decide just how broadly the transfer provisions may reach in order to conclude that they do not extend to the kind of mere economic leverage that the trustee relies on here. While control over an asset is a necessary condition of ownership, it is not a sufficient one. *See Kingsbury v. Christy*, 21 Ariz. 559, 192 P. 1114, 1115 (1920) (legal rights in property necessary despite control); *Cutter Aviation, Inc. v. Arizona Dep't of Revenue*, 191 Ariz. 485, 958 P.2d 1, 6 (Ct.App.1998) (quoting

---

\* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36–3.

Black's Law Dictionary to the effect that a "*sine qua non* of ownership is the right to control and dispose of the asset.").

The trustee argues that there is a triable issue of fact whether Symington had control over the $60,000 Shimizu settlement payment and the Esplanade listing on account of his showing that the Esplanade was in severe financial distress; any sale required the approval of the Esplanade partnerships controlled by Symington; Symington and Shimizu agreed in late April of 1993 that Symington would depart from the Esplanade and Seville projects in exchange for Shimizu assuming Symington's liability on a $9 million personal guaranty in favor of a third-party; and shortly after September 14, 1993, Symington learned about Shimizu's internal deadline for completing the Esplanade sale. Assuming all this is true, it does not show that Symington owned or had any right to control and dispose of the $60,000 that Shimizu paid directly to Todd. Although there is some evidence that Symington and Shimizu at one time discussed Symington's being paid $860,000—from which the trustee invites us to infer that Symington allocated $60,000 of it to Todd—there is no evidence that Symington and Shimizu had agreed on the figure of $860,000 such that Symington ever had a contractual right or interest in that sum or in the $560,000 remaining after the Seville Subtier's share had been apportioned. Absent such evidence, it is immaterial whether the parties differ about how the transfer to Todd should be characterized. Nor does it matter that Symington made an additional settlement demand after Shimizu had disclosed its internal deadline, or that he may have convinced Shimizu to attribute the settlement proceeds to the Seville project rather than the Esplanade.

Next, the trustee contends that Symington controlled the listing. Symington told Shimizu how important he thought it was for Todd to be involved in the Esplanade's sale, and no doubt Symington encouraged Shimizu to make Todd the broker. He also bargained for language in the agreement with Shimizu requiring his consent before CORE could be terminated. However, these acts are distinct from a right to decide who should broker the transaction and to direct the business accordingly. It is undisputed that this right reposed in Shimizu.

Finally, the trustee maintains that the control test applies to the transfer of The Symington Company's (TSC) contracts, furniture and equipment, and good will. He also contends that the district court improperly skirted the test by holding that Symington could not have indirectly transferred the value of his stock by transferring the assets of TSC because TSC was insolvent before the transfers took place. Even if this weren't error, the trustee maintains that the court should not have used a liquidation analysis to measure the value of Symington's stock. We disagree. There is no dispute that the assets Todd acquired from TSC were owned by the company. "By the very nature of a corporation the corporate property is vested in the corporation itself and not in the stockholders." *Corporation Comm'n v. Consolidated Stage Co.,* 63 Ariz. 257, 161 P.2d 110, 111 (1945). Symington therefore did not own the corporation's property. The trustee contends that there is a triable issue whether Symington nevertheless controlled transfer of the corporate assets because TSC had lucrative management and leasing contracts to the Seville and Esplanade projects which ended up in Todd's hands immediately upon TSC's withdrawal; because the fair market value of the furniture and equipment was more than Todd paid for it; and because TSC's goodwill as a going concern consisted mostly of the management and leasing contracts that were transferred to CORE. However, whether or not Syming-

ton caused TSC to transfer these assets, he did not transfer his own property. There is no alter ego issue here. Further, assuming that Symington indirectly transferred his interest in his TSC shares when TSC transferred its assets, it is uncontroverted that TSC was insolvent from 1989 through 1992. Thus, as the district court concluded, the only effect of the transfer of TSC's assets was to make Symington's stock more worthless than it already was. The trustee's only argument to the contrary is that this "liquidation analysis" overlooks the "control value" associated with TSC stock—the value, as he puts it, that someone would pay for the stock in order to get control of the company as a going concern. However, there is neither evidence nor authority to support this view.

AFFIRMED.